The first case this morning is number 07-1438, Sanofi-Synthelabo v. Apotex. Mr. Breisblatt. Good morning, Your Honors. Robert Breisblatt on behalf of Apotex. It's our position that the court should reverse the trial court's decision that claim 3 of the 265 patent was valid. The trial court erred as a matter of law in finding that claim 3 was not obvious. Two conclusions of law on page 88, A88, are wrong as a matter of law based on KSR. And its conclusions on A88 of non-obviousness of possible outcomes, where the court found that the secondary considerations did not show non-obviousness, further established it. Plus, a lot has changed since this court dealt with this matter in the preliminary injunction. Yes, I was going to ask you which aspect of KSR are you particularly relying on? I'm relying on the aspects of KSR where the court said in KSR that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. And that's what we have here. If we look at the three items that we've isolated that were not in front of this court at the preliminary injunction stage, nor the district court judge, but were in front of the court at the trial and he recognized, it leads us to the conclusion that all that was done here was following a regulatory mandate to separate enantiomers, test each one, and in this case, that's exactly what Sanofi did, followed what the regulatory requirements had become in Japan and the United States, and reached the obvious conclusion that the dextrorotary enantiomer was best, and all they did was salify it, and they did it following the traditional scientific rule of 2-PKA. That is, they used a strong acid, ones that had been disclosed in the Canadian prior art patent, and in fact, they got a sulfate. And it was no better than the other claims in the 2-6-5 patent, salts of clopidogrel. If you go back and look at the 2-6-5 patent, we discover at claim 2, they claim the hydrochlorite salt. At claim 4, the bromidine, the hydrobromide salt of clopidogrel. Before you get too far along the line, away from KSR, the third element of KSR that you recited, if I think correctly, was achieving predictable results. Correct. But the trial court in this case, after a trial, as a finding, found that the results were not predictable. So your task, I take it, to bring this case within KSR, I think you'll agree with me, is to show that that finding was clearly erroneous. Well, it was also a finding, an error of law, because KSR did not require the absolute predictability that the trial court found one had to show in this case. Remember, the trial court found that, in fact, the prior art did show that one of the expected results, when you separate enantiomers, was to find that one was better than another. In fact, he found that specifically when he talked about the prior art and he said, and I can get the exact quote. I thought that the trial judge was pretty thorough and had expert testimony and reached a finding that, in some cases, you find that all the activities in one isomer, in some cases it split and recited particular compounds where it went both ways. Right. And that, in fact, means that the expected result, one of the expected results, remember, KSR doesn't say absolute predictability. Which is what the trial court was looking at. What KSR suggested, if one skill in the art follows known methodologies and gets one of the expected results, a predictable result, then it's obvious. You mean you get it all over here or all over there or a mixture, they're all expected? They would all be expected and you don't know until you test it. All possibilities are expected. Well, in this case they are and in the case of the separation they are. And I'll use an example. I live in Chicago. If someone said in August before a January, would one expect it to snow in January, we'd all say yes. Could one say specifically it would snow on January 10th? And the answer is no. The expected result, if it does snow on January 10th, is it was obvious it's January in Chicago. In this case, one of the expected results was that the enantiomer would show the therapeutic values of the rescement. And it did. And it wasn't unexpected because we already had errors that said that was a possibility. And this court explored it back in the Adamson case where this court found that that was one of the expected results. If we're going to get to absolute predictability, we leave KSR. Because one doesn't know until they test. And in this case in particular, prior to the filing date of the 265 patent, you had the FDA in its regulations, which the court found, saying specifically when the NDS, the new compound, is asymmetric, which this one was, one new, the sponsor should ideally, and prior to the submission of an IND, have either separated the various potential stereoisomers of the NDS or synthesized them independently. When was that regulation promulgated? The regulation was promulgated in February of 1987. That's age 17509. What's the critical date here? February of 1987. So this isn't a regulation that was in place, depending on when in February, I suppose. There's two things. One is Sanofi's own expert. I know there's a Japanese. But the FDA's regulation wasn't in place at least any considerable period of time before that. Well, the Japanese regulation in A16139 put in Sanofi's own expert. Anyway, correct me if I'm wrong about this. Isn't the French priority date February of 86? No, it would be February of 87. And that's what the district court judge found. And it says, when the compound exists as a racemic modification, it is desirable to examine the absorption, distribution, metabolism, and excretion behavior of each isomer. That's straight out of the Japanese 1985 regulation, which the court referred to as NACIC regulation. When a regulation is telling you to do something, you do it. You get the known result. The regulation says, ideally, you say that that's in order? I'm sorry, Your Honor. The regulation, as you read it, says that the applicant will ideally separate the isomers. The Japanese said, when the compound exists as a racemic modification, it is desirable. And Sanofi itself, in their own internal argument... You're saying that's a requirement, saying it's desirable. In fact, Sanofi itself, on page 815350 of its own memorandum, written on November of 1987, said, for Japan, it also seems that it would not have been possible to apply for an NDA with a racemic in such a case, because they note the trend in regulatory requirements would have made it difficult to get NDA approval with a racemic, either in France or in Europe or in the United States. So, if one isn't saying it's a requirement, it's clearly a strong suggestion by regulatory agencies. And even Sanofi's experts said, in 1986, FDA representatives were coming to Europe and discussing this guideline. So, your argument is that you know that when you separate the isomers, you'll find one or the other may or may not have more activity and less side effects than the other. And therefore, no patent is available on any of that work. Particularly where all you're getting is a result that is twice better. So, just like in the Adventist page, where you remove the impurity in the separation process... Are you saying it depends on the degree of difference, when you said particularly? I would suggest, if you're looking for an unexpected result, and when you did the separation, you got a, let's say, a thousand to one difference, something so unpredictable, that it would be an unexpected result. Even then, I guess the question is, as a public policy, if you follow a regulation, and you do a separation, and you test it, and you get the result that anyone skilled in the art would get, is that admirable? I would have thought your answer to Judge Newman's question would be that it doesn't matter how good the result is. You get no inventive, there's no inventive aspect to simply separating the racemic mixture to its anatomy. And that is correct. There is no... Oh, okay, so you're abandoning the one thousand to one argument. That would be so unexpected that I think one could make an argument, but I think they'd still have to get over the hump that... Well, you wouldn't agree with it, if one made that argument. You would disagree with that argument. I take it. I mean, I'm trying to see what your argument is, and it seems to me your argument does not admit of any greater versus lesser quality of outcome. With this regulation, I would have to say that's absolutely correct. I think if you follow what you're required to do, and you have a known receiver, and the result isn't any different therapeutic, because remember, the therapeutic benefit of the enantiomer was the same as in the racemic mixture. Are you also abandoning your anticipation argument? No, I'm not. What I've heard mostly relates to, entirely really, obviousness. I'm sorry, Steve. What you've been arguing relates specifically to obviousness. I'm not abandoning our anticipation. In fact, we believe it's a good anticipation argument based on the Canadian patent, which again was not in front of this court at the preliminary injunction here. Well, the Canadian patent didn't describe the D enantiomer bisulfate. What it described was the enantiomer. It simply had a general statement that these compounds exist as racemates, and we also claim the enantiomers without telling how to get them. No, it's actually more specific than that. I think that's one of the things that this court missed. When you go to the Canadian patent, and you go specifically to the Canadian patent at claim 8 of the Canadian patent, what claim 8 of the Canadian patent at A23027 states is it specifically points to the process according to claim 1 for preparation of, and the next thing is PCR 4099, so it's the racemic compound. The process according to claim 1, when you read claim 1, says, if desired, its enantiomers are separated, which is the dextroenrotating enantiomer, or it is salified by mineral or organic acid action. So here, unlike the 565, which this court dealt with, the 595, which this court dealt with at the preliminary injunction hearing, the Canadian patent was not there. Here you have the specific reference. Claim 8 tells us the process according to claim 1 for preparation of PCR 4099, and when you go back to claim 1, it tells us, if desired, its enantiomers, the enantiomers of PCR 4099, are separated and salified by mineral or organic acid action. When we look at the descriptions in the first part of the Canadian patent, the strong acids that are used, and all of the experts agree, that the delta-2PK would apply, and that sulfuric acid as well as the hydrochloric acid would fall into that category. So one reading, the Canadian patent, would in fact find that the claim, and the claim we're dealing here with is simply the dextroenrotating enantiomer. The claim is not supported by any description of how the enantiomers are separated, or it doesn't even name the enantiomer bisulfate. It names the enantiomer and it uses the words organic or mineral acids. But this is anticipation we're talking about. We are. Anticipation of a chemical compound. Correct. Requires that the chemical compound existed in the prior art. Not generically, but specifically. And this is specific. Claim 8 specifically describes the racemic PCR 4099. And it tells you that you should prepare it as stated in claim 1. Claim 1 specifically says, if desired, its enantiomers are separated and or it is salified by mineral or organic acid action. And that is a specific enough description, because separation here, when they tried to apply for a patent for it, the examiner found it to be obvious. It was the classic method. It's disymmetric salt, which this court, when it decided for us, noted that that was one method that was tried and did not work. Here it worked. And it worked in less than 30 days, using the only thing they were left with, strong, optically active acids. And this is what KSR tells us. We bring all of what one skilled in the art would know. One skilled in the art would have known about 2PKA. It would have known that separation techniques like Pasteur was available. And in this direction to separate, it doesn't have to tell you, well, to separate you should use PAMP or Cephalon. It's written in a patent. And it's presumed that one knows how to do it. I've reached the end of my time, and I'm miserable five minutes for rebuttal. No, you've exhausted your rebuttal time, but we'll give you one minute. Thank you. Okay. Mr. Chesler. Good morning, Your Honor. Evan Chesler, full staff here. I'd like to begin, because counsel spent preponderance of his time on obviousness, I'd like to begin there, and then I'll say a few words about anticipation. With respect to obviousness, the quotation from KSR, counsel alludes to, says that it involves the combination of familiar elements. There was no combination here of known methods. The record here, as the court found in multiple findings of fact, was that there was enormous difficulty in figuring out how to separate this racemate. Indeed, Sanofi spent five months, failed multiple times, tried a methodology that had worked with a different racemate some years before, and that failed, and went through a number of different iterations before it succeeded, to yield predictable results. That's what KSR says. There was a lot of evidence that was the subject of the court's findings on this issue, but I just want to point the court to two pieces of evidence. Mr. Breisbott says that all of the possibilities were predictable. Yes, and indeed, respectfully, Mr. Breisbott's wrong about that, and if he were right, it would mean there was no way that you could avoid obviousness. Well, that's what he's saying here. Yes, I understand, and with all due respect, I disagree. It is not obvious here. Let me just, if I may, point the court to two pieces among the many pieces of evidence here. This is my cross-examination of Dr. Snyder, one of Apotex's experts. They had another expert named Hendrickson, who, after his deposition, they decided not to call. I confronted Dr. Snyder with one piece of Dr. Hendrickson's deposition testimony at trial and cross-examination. This is the cross-examination piece. It's at A.1.1.2.1.5 and 1.6. I say to Dr. Snyder, Dr. Hendrickson was asked this question, and I'm now quoting from the deposition question, and there are also convulsion effects with the racemic compound, talking about 4.0.9.9. Would you agree you cannot predict in advance that one nanotuber will cause the antithrombotic activity and the other one is the one that causes the convulsion activity? Answer, Dr. Hendrickson. No, I certainly don't believe you could predict that without separating them and trying it. I cannot imagine anybody presuming anything else. I then ask Dr. Snyder, do you disagree with that testimony, sir? Answer, no. Question, do you agree with it? Answer, yes. These are two of Apotex's experts, have both testified that they could not imagine anybody presuming anything other than you could not predict this entire decoupling of efficacy and toxicity. But his argument is that when you know that the racemic mixture can cause convulsions, you may very well expect that one or another isomer is more responsible than the other. And that there's no patentable invention in finding out which one. Yes, and the answer, Your Honor, is the record here shows there was no way to predict that it would change at all. Indeed, the prior art showed all possibilities. In other words, for example, it said that the likelihood that one nanotuber would have all of the activity, that there would be what's called complete stereoselectivity, was rare. Their own expert relied upon a piece of prior art that had a diagram of the incidence of this and conceded on cross-examination that it was quite rare that in fact you would have all of the activity in one. The prior art also said that toxicity typically followed activity. So one would expect that the more active enantiomer would be the more toxic enantiomer. Here, it was not only not the more toxic enantiomer, but all of the neurotoxicity that was causing the convulsions in the animals in which the drug was tested was all in the levorotatory enantiomer. The evidence here, Your Honor, was that that was entirely unexpected, and there was no reason to believe that separating the enantiomers would result in any other outcome. In fact, in the course of Sanofi's development of this drug class, they synthesized 600 theanopyridine racemates. They only tried to resolve three of those. In 597 cases, when they ran into any kind of adverse effects or any kind of efficacy issue, they changed substituents in the formula and synthesized a different compound. That's what they did in virtually every single case. So the evidence here is not only that the prior art did not tell you that you had any reasonable basis to expect that if you separated the racemate, you'd find all of the efficacy on one side and the toxicity on the other, but indeed, quite to the contrary, the expectation was, as this court held, as this court held in its decision in the Forrest Labs case, it was far more reasonable in the state of the art at that time, by the way, Forrest Labs was talking about a slightly later point in time than we're talking about here, far more reasonable to synthesize a different compound than to undertake the difficult and unpredictable process of trying to resolve the racemate. That was true at the time of the record made in the Forrest Labs case. It was even more true at the time of the record here. Just to make sure that I've got the right date, what is the critical date here? I believe it is February of 1987. And there was no, as your honors, I think, pointed out in Mr. Breisbart's comment, there was no regulatory requirement about anything of the sort. There was some very preliminary discussion about this concept. In fact, one of our witnesses, he was the head of organic chemistry at Oxford University, Professor Davis said, it wasn't until a decade later that a company that he founded for the purpose of resolving racemates had any real success, because it was only then, about a decade later, that this became something that people really looked at in earnest. Your honors, this was a company that was under enormous commercial pressure to come to the market with a successful product. If anyone had an incentive to do what was supposedly, according to the defendants, obvious, it would have been these scientists who were struggling to try to find a new drug. They spent four years, according to this record, and spent, as the court below found, tens of millions of dollars developing the racemate before they found that they, in fact, succeeded in separating it, did the testing, found this entirely unexpected separation of efficacy and toxicity, and then, in fact, killed the program. Plaintiffs' Exhibit 57, in this case, is a memorandum by Dr. Simone. He was the head of research at the time at Stanford. It is contemporaneous, compelling evidence. He says, the L form was more toxic, and was specifically responsible for convulsions observed in animals at high doses. Under these conditions, it appears clear to me that we cannot envision development of the racemate, and I have decided to stop this development. That's March of 1987, by the way. That's eight months before the Sadafi memo, to which Mr. Breisbart refers, when they're retrospectively looking at the development and saying, well, you know, separating that racemate into an antemur has turned out to be a pretty good idea. That's eight months after the head of research killed the racemic development program in favor of the dextrorotatory antemur, because they had found this entirely unexpected outcome of a separation of toxicity and efficacy. So you're saying there's lots of evidence, but what does KSR do to this? Do we toss aside our earlier case and start from scratch? No, Your Honor, I don't think so, because what KSR again says, in the third leg of the test, and I've mentioned the other two already, it must yield predictable results. What KSR was talking about is looking at prior art, in that case, as you well know, about this accelerate pedal. It was looking at pieces of prior art which had the two elements, taught how to combine them, and predicted what the outcome would be. It's very much like the salt case that was decided by this court not that long ago, involving the desolate salt. Pfizer? Is that the case you're thinking? Yes, Your Honor. Where they were saying, we know what the problem is, we know what the cause is, and when their expert was questioned on cross-examination about what he thought the outcome would be, he said, we expected the desolate to work. It wasn't guaranteed, but we expected it. Let me see if I understand what role you think that unexpected results play in this analysis, and particularly with attention to KSR and the post-KSR cases. Suppose we have something in which there isn't any challenge presented by way of the mechanics of separation. Suppose, for example, somebody comes up with a leaf off a tree from the Brazilian rainforest that both has very powerful anti-cancer effects, but also has side effects. It's analyzed and it's determined that it has two compounds that appear to be the principal sources of both the therapeutic and the toxic effects. Now, I suppose there's no reason to expect that you'd have the therapeutic and the toxic effects divided between the two compounds, but wouldn't it be obvious to try, since you have two compounds and a total class of two, wouldn't it be obvious simply to try each one in turn? I don't think so, Your Honor. So it would be patentable invention over the combination of the two compounds to have one as opposed to the other, without the other. If the result was, as the court said in KSR, unpredictable. Remember, the words are yield predictable results. Here, Your Honor, I don't think you can separate your hypothetical from the record of what the prior art showed you. What the record of the prior art showed here was that it was not at all predictable. That one side would be entirely stereoselective and the other side would be none. Their own expert conceded that that was rare. The prior art on which he relied showed that it was rare. The testimony of the inventors here said it was rare. They didn't expect it. They went into the separation decision having no idea whether it was rare or not. And also, Your Honor, the record was that the prior art showed that typically there was a correlation between efficacy and toxicity. The idea that you would end up with none of the toxicity in the dextrorotatory entiment and all of the efficacy was not expected, it was not predictable. So I think if you place Your Honor's hypothetical into the context of what this record showed, of what the prior art actually taught, and we haven't talked about the difficulty of actually doing it, Your Honor's hypothetical assumes there was no problem about that, nor have we talked about the salt here, where the record shows that there was, in fact, all three of their experts who testified about salt all said it was unpredictable. All of them. And as the district court found, the prior art caught away from it. There were at least two critical pieces of evidence that showed on the salt that the prior art caught away. One was a reference called Gould, where the reference said that if you have hygroscopicity, which is the tendency to accumulate moisture, you would look to carboxylic acids, not strong mineral acids such as sulfuric. Yet here, it was sulfuric acid and the creation of the bisulfate salt that ultimately worked. So Gould, as the district court specifically found in a finding that I respectfully submit, is not clearly erroneous, taught away from the salt. Similarly, Dr. Davis testified, Professor Davis testified, that because of the particular structure here, one would expect that the use of that type of acid here would cause or might cause racemization. That is, the recombination of the enantiomers into a racemate. And again, that taught away from using the kind of strong acid that was used here to create the bisulfate salt. Similarly, similarly, the chemical structure of 4099 here strongly suggested, because it only worked in vivo, that the mechanism of action that actually created the salutary effect in the body was via metabolization and some metabolite in the body. Not the pro-drug that was actually taken. There was no knowledge at the time of what the structure of the metabolite was. There was no knowledge of how the metabolite worked. There was absolutely no basis in the court so found to believe that separating the racemate into an enantiomer would have some different effect on the liver and cause the metabolization of some different metabolite or the same metabolite that was bringing about the salutary effect. So respectfully, Your Honor, I think the example of the leaf off the tree needs to be looked at in the context of this case. Well, the reason, obviously, for the leaf off the tree is to try to see exactly what your view of the requirement of unpredictability is. I understand. So, I take it your answer to the leaf off the tree is no matter how simple the process and no matter how few ingredients we're dealing with, as long as there isn't some prior art basis for predicting the outcome, that there's no obviousness. Yes, as long as there's no prior art basis on which you can reasonably believe that separating those two compounds in that leaf was going to yield a better result, not only better in terms of efficacy, but it was also going to get rid of this side effect that you're talking about. And therein is the key here. The court itself specifically questioned virtually every one of the experts who got on the stand on this subject and asked them about their understanding of the likelihood, the predictability, the reasonable expectation that you have more or all of the efficacy on one side. And what about the separation? What about the separation of the toxicity? Even their most enthusiastic advocates conceded, both in cross-examination, in one case by Mr. Bechtold, in another case, a question from the judge, that it was far less likely to know that there'd be the separation of toxicity and efficacy that, in fact, was found than the idea that the toxicity would go with the efficacy. And that's a critical part of this. That was the invention. That's exactly what the Patent Office found here. The Patent Office, who, by the way, was the same examiner on both patents, 596 and the later patent, found that, in fact, it was the invention that was worthy of a patent, except for the fact of the prior reference, which is why he suggested substantial separation language being put in. It was put in the claim that claims were allowed. What do you have to say about the Canadian patent, briefly? Yes, Your Honor. The Canadian patent doesn't change anything. The Canadian patent describes racemates just as the U.S. patent does. It does not enable how to separate the racemate into its enantiomers. The claim that Mr. Breisbart was referring to, claim 8, talks about the racemate. It recites the formula of the racemate. You can't read dependent claims into independent language. And it does not add anything. Just as the District Court found when it looked at the Canadian patent. It said it didn't change the analysis whatsoever. Okay. Thank you, Mr. Chancellor. Thank you, Your Honor. Mr. Breisblatt. Thank you, Your Honor. I'd like to read a quote from Adventist, and how it ties into KSR, because I think that was a question this Court asked. However, it is known, and this is from 1301 of the Adventist decision of this Court, 2007. However, if it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, or if the prior author provide a person of ordinary skill in the art with a reason to believe that this is so, the purified compound is prima facie obvious over the mixture, even without an explicit teaching that the ingredient should be concentrated or purified. And the Court goes on in 1302 and says, Ordinarily, one expects a concentrated or purified ingredient to retain the same properties exhibited in a mixture, and for those properties to be amplified. That's exactly what occurred here. When the ingredient is concentrated or purified, isolation of interesting compounds is the mainstay of the chemist's art. It is known how to perform such an isolation. Doing so is likely the product not of innovation, but of ordinary skill and common sense, the site is the KSR 127 Supreme Court in 1742. The other thing I would like to add real quickly, if I may, the statement that it was rare doesn't mean it's not predictable. People knew that when you separated a racemic compound, you could in fact wind up with all of the good and none of the bad, and Judge Stein cited that. That is the critical part here. One knew that occurred. Is it predictable? Yes. It is one of those things you would predict. The regulations required you separate it, and this racemic compound, Sanofi told the world in 1985 in the poster presentations, was the one. All that formula, that all came before it. They gave that up in 1985 when they went to San Diego and told the world that PCR 4099 has this kind of therapeutic effect in man, and it's a racemic mixture. Okay. Thank you, Mr. Bryce-Flatten, Mr. Chancellor. The case is taken under submission.